## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| **AMERICAN HERITAGE LIFE INSURANCE COMPANY,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:17-cv-698-J-32MCR** |
| **NEW ENGLAND BENEFITS CONNECT, LLC,** | |
| **Defendant.** | |
| **NEW ENGLAND BENEFITS CONNECT, LLC and MARK C. GEISSLER,** | |
| **Counterclaim Plaintiffs,** | |
| **v.** | |
| **AMERICAN HERITAGE LIFE INSURANCE COMPANY** | |
| **Counterclaim Defendant.** | |

### ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT, COUNTERCLAIMS AND DEMAND FOR JURY TRIAL

Defendant New England Benefits Connect, LLC ("NEBC") answers the Complaint (Doc. 1) as follows:

### PARTIES

1.      NEBC is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

2.      Admitted.

## JURISDICTION AND VENUE

3.      Admitted.

4.      Admitted.

## FACTS

5.      NEBC is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

6.      Admitted.

7.      NEBC is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

8.      NEBC is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of this paragraph.  Otherwise, admitted.

9.      The Agent Agreement is a document that speaks for itself, thus no response to this paragraph is required.  To the extent a response is required, NEBC denies Plaintiff's characterization of the Agent Agreement in this paragraph.

10.     The Agent Agreement is a document that speaks for itself, thus no response to this paragraph is required.  To the extent a response is required, NEBC denies Plaintiff's characterization of the Agent Agreement in this paragraph.

11.     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, admitted.

12.     The Agent Agreement is a document that speaks for itself, thus no response to this paragraph is required.  To the extent a response is required, NEBC denies Plaintiff's characterization of the Agent Agreement in this paragraph.

13.     NEBC is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     NEBC is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

18.     Denied.

19.     This cease and desist letter referenced in this paragraph is a document that speaks for itself, thus no response is required.  To the extent a response is required, NEBC denies the characterization of the cease and desist letter in this paragraph.

20.     Admitted.

21.     NEBC is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.  NEBC denies the characterization of AHL's actions as a "clerical error".

22.     Denied.   Plaintiff mischaracterizes NEBC's demand.

## CAUSE OF ACTION - DECLARATORY JUDGMENT

23.     This paragraph states a claim for relief, thus no response is required.  To the extent a response is required, NEBC denies that Plaintiff is entitled to the relief sought.

## PRAYER FOR RELIEF

24.     This paragraph, mistakenly numbered as 22 in the Complaint, states a claim for relief, thus no response is required.  To the extent a response is required, NEBC denies that Plaintiff is entitled to the relief sought.

## AFFIRMATIVE DEFENSES

1.     Plaintiff fails to state a claim upon which relief can be granted.

2.     Plaintiff is barred from relief by the doctrine of unclean hands.

3.     Plaintiff is barred from relief by its own fraud.

4.     NEBC reserves the right to assert additional affirmative defenses as they become known through discovery in this matter.

**WHEREFORE**, NEBC respectfully requests that this Court:

1.  Dismiss the Complaint with prejudice;

2.  Enter a judgment in favor of NEBC and against AHL;

3.  Award NEBC attorneys' fees and costs; and

4.  Award NEBC such further relief as the Court determines is just and proper.

**NEBC AND MARK GEISSLER'S COUNTERCLAIMS
AND DEMAND FOR JURY TRIAL**

NEBC and Mark Geissler ("Geissler") (collectively, the "Counterclaim Plaintiffs") assert these Counterclaims for payment of damages suffered by the Counterclaim Plaintiffs as a direct result of AHL's breach of contract and breach of the implied covenant of good faith and fair dealing, and as a result of the unfair, deceptive, and tortious actions of American Heritage Life Insurance Company ("AHL"), and in particular the actions of AHL's Regional Director, Northeast Michael A. Martocci ("Martocci").

**PARTIES**

1.      Geissler is a Massachusetts resident with an address of 3 Crossman Lane, Danvers, Massachusetts.  At all times relevant, Geissler has been the owner, President and CEO of NEBC.  Beginning on or about August 19, 2011 and continuing up through the present, Geissler has been an insurance agent duly licensed to operate in the Commonwealth of Massachusetts, licensed by the Massachusetts Division of Insurance, License Number 1903918.

2.      NEBC is a supplemental benefits broker, assisting municipalities including the City of Boston in the selection and procurement of voluntary supplemental insurance benefits for its employees (*i.e.*, non-health care coverage, including disability, accident, life and critical illness insurance benefits).

3.      NEBC has created a service-oriented business, which assists in securing coverage and continues to service covered employees with claims questions and other issues after coverage becomes effective.

4.      Geissler joins in this Counterclaim pursuant to Rule 20, Federal Rules of Civil Procedure, because (a) Geissler asserts jointly with NEBC a right to relief with respect to and arising out of the same series of transactions and occurrences and (b) questions of law and fact common to Counterclaim Plaintiffs will arise in this action.

5.      The Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. section 1332 because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## FACTS

### NEBC and the City of Boston

6.      NEBC's owner Geissler and others at NEBC spent years cultivating relationships with relevant individuals in the City of Boston and the Labor Unions representing the City's employees.

7.      As the result of Geissler's years of hard work and preparation in cultivating these relationships, in late 2014, NEBC was in the position to begin working with the City of Boston Fire Department ("BFD" or "the Department"), assisting BFD in selecting a new carrier to replace Transamerica, the Department's then-Disability, Accident, Life and Critical Illness insurance carrier.

8.      Hubbard & Preston ("H&P") is an insurance broker licensed in the Commonwealth of Massachusetts, and at all relevant times served as an approved vendor for the City of Boston and the insurance broker of record for the City of Boston.

9.    Because H&P already had a payroll deduction slot in place for City of Boston employees, NEBC partnered with H&P in securing voluntary supplemental insurance coverage for the City of Boston, focusing first on the Fire Department.

10.    On February 4, 2015, NEBC and H&P entered into a Collaborative Marketing Agreement, agreeing to collaboratively market voluntary insurance benefits to the City of Boston and split any commissions earned as a result of that marketing.

11.    NEBC, working along with H&P, solicited and received proposals for the BFD from a number of insurers, including AHL, for whom H&P served as the Broker of Record in Boston.

12.    On January 6, 2015, Martocci transmitted a Product Proposal (the "Initial Proposal") for the Department, to NEBC and H&P.  In relevant part to this Counterclaim, the Initial Proposal included Group Voluntary 24 Hour Accident Coverage and specified the benefits for a "Low Option" as two units of coverage and set forth the corresponding premiums.

13.    At the same time, NEBC also received a proposal from Combined Insurance ("Combined"), which proposal was provided to Martocci for comparison, along with the terms of the Transamerica coverage already in place at BFD.

14.    In addition, Martocci carefully reviewed the premiums already in place for BFD employees to ensure that any employees who transitioned to the AHL product would not experience increased premiums.

15.    On January 14, 2015, Martocci sent an email to Geissler at NEBC and H&P outlining AHL's proposed rates for "AHL Group Accident with 24 Hour Accident

Only Disability Rider." Martocci compared AHL's quoted rates to those already in place for Transamerica (AHL's quoted rates were lower) but did not compare or include the Combined rates, simply noting that Combined's rates were "even higher than Transamerica for Accident."

16.     On January 19, 2015, Martocci provided another formal proposal (the "Second Proposal"), which included the same coverage and rates for Group Accident outlined in his January 14, 2015 email, as well as the 24 Hour Accident Only Disability Rider, and the same benefit levels as the Initial Proposal.

17.     Martocci noted that AHL's quoted rates were lower than both Transamerica and Combined, and "provide room for Doug's adjustments."

18.     The reference to "Doug's adjustments" relates to certain adjustments for Third Party Administrator fees H&P's Doug Snowman ("Snowman") had requested the ability to make. Martocci knew that the ability to make those adjustments was important to H&P.

19.     Martocci also communicated that a "Group Case set-up form needs to be completed (I can complete it for you and then forward to you)."

20.     On January 26, 2015, AHL provided its Underwriting Offer to NEBC. In relevant part, the Underwriting Offer provided Group Voluntary Accident (GVAP1) with a "Benefit Enhancement Rider."

21.     While the Underwriting Offer did not specify coverage limits, Martocci had represented to Geissler that the Underwriting Offer coincided with the Initial Proposal and the Second Proposal (collectively, "the Proposals").

8

22.     Based on the Proposals, the Underwriting Offer, and Martocci's representations Geissler, on behalf of NEBC, selected AHL to provide benefits coverage to the Boston Fire Department.

### AHL and Martocci's Deception

23.     On January 23, 2015, Martocci sent an email to NEBC's Mark Geissler with the Subject Line "Account Set Up – PLEASE SIGN, SCAN and EMAIL BACK PLEASE!"

24.     The attachment to the email was Page 3 of 3 of a document with the code ABJ4040-6, which NEBC and Geissler later learned was referred to at AHL as a "40/40" form.

25.     In April 2017, Martocci stated – for the first time to NEBC's knowledge – that the 40/40 form "trumps everything" to establish the coverage purchased.  Martocci did not explain the import of the 40/40 form when he sent it to Geissler in January 2015, merely indicating that it was required for Account Set Up.

26.     The single Page 3 of 3 of the 40/40 form transmitted in January of 2015 had been filled out by Martocci, designating NEBC as the Agent of Record, and Mark Geissler as the Authorized Officer.

27.     On information and belief, Martocci designated NEBC as the Agent of Record, instead of H&P, the already-existing Broker of Record for AHL in the City of Boston in order to maximize his own commission on the case.  On information and belief, Martocci would earn a higher commission if a "new" Agent of Record was associated with the case.

28.     The section of the 40/40 form that Martocci inserted Geissler's name into was entitled "Acceptance of Voluntary Insurance" and stated the City's agreement to establish a voluntary insurance program for the benefit of its employees/members.  At no time did Geissler have the authority to bind the City of Boston to such an agreement.

29.     Geissler was not the Authorized Officer for the City of Boston; on information and belief, that signature should have been of a City representative, not an insurance agent.  On further information and belief, no City representative ever officially authorized the sale of AHL voluntary insurance products to the BFD.

30.     Because his work on behalf of the BFD was Geissler's first time working with AHL, he was not familiar with the 40/40 form or AHL's internal policies and procedures.  Trusting that Martocci had filled the form out accurately, however, Geissler signed and returned the signature page that same day.

31.     On information and belief, Martocci deliberately sent the 40/40 form only to Geissler, and not Snowman or H&P as the AHL Broker of Record, because he knew that Geissler had less experience in the industry than Snowman and H&P.  On further information and belief, Martocci deliberately included NEBC as the Agent of Record, instead of H&P, in order to maximize his own commission on the case.

32.     NEBC did not see a full version of the 40/40 form, including Pages 1 and 2, until April 10, 2017, when H&P requested a copy from Martocci.

33.     Notably, the page of the 40/40 form setting forth the Accident benefit for rollover employees (i.e., employees already enrolled in Transamerica products for whom

NEBC facilitated a passive rollover to AHL) provided only One Unit, while the Proposals promised double the coverage, or Two Units.

34.     The certificates of insurance ultimately provided to enrolled members at the City of Boston Fire Department contained the Single Unit coverage only.

35.     Upon information and belief, AHL and Martocci deliberately undersold Transamerica and Combined to get the case, and then performed a "bait and switch," providing half the coverage promised.

36.     AHL has admitted that it issued policies to the rollover employees differing from the Proposals.  On April 18, 2017, Gary Stere, AHL Benefits General Counsel, sent Martocci an email to "share with the broker" stating:

> "This responds to your email today to Marilou requesting a written description of our plan regarding the City of Boston employees who changed their coverage to the AHL Benefits GVA1.  We understand the policies were issued about 2 years ago with benefit levels that differed from our original proposal.  In response to the request from the broker, we intend to issue replacement certificates to this group to reflect those benefit levels.  The effective date of the change will be stated on the certificates, and will not be retroactive."

37.     AHL's proposed solution was inadequate, because the change was not retroactive.  On information and belief, after pushback from H&P regarding this less than adequate proposed solution, AHL Benefits again sought to solve the problem.  Clark Watkins, Senior Vice President, informed H&P that:

> "AHL is planning on honoring the benefits quoted in the proposal for the Transamerica takeovers for the City of Boston employees.  This will go back to the original effective date.  We will also reissue certs to the employees with the original effective date.  Also claims will look at each submitted claim during the time since the original effective date on these employees and if there is a difference in the claim amount we will pay to the employee.  Thanks."

**Harm to NEBC and Geissler**

38.     In order to win the City of Boston business, Martocci, acting on behalf of AHL, underbid Combined and Transamerica and quoted NEBC and H&P a proposal that he and AHL had no intention of honoring.  Instead, lesser coverage was put in place for BFD employees, while AHL collected the premiums quoted in the Proposals and the Underwriting Offer despite not providing the coverage supporting those premiums.

39.     AHL's actions in providing only half of the accident coverage promised in the Proposals significantly harmed NEBC and its relationships with H&P, the City of Boston, and the Labor Unions representing City of Boston employees.

40.     Following selection of the AHL product, NEBC immediately began the work of enrolling new Fire Department employees as members, and processing a passive rollover of existing City employees enrolled in the Transamerica products, into the AHL products.  This process entailed numerous meetings, mailings and phone calls on the part of NEBC.  The new enrollees and the employees involved in the passive rollover were promised the Accident coverage outlined in the Proposals.

41.     As part of that rollover process, NEBC sent a letter to BFD employees ("BFD Letter") regarding the change to AHL from Transamerica.  That letter stated "This new benefit offering is not only less expensive than your current Transamerica Plan, but also provides the same, if not better, insurance coverage."

42.     Martocci assisted Geissler in drafting the BFD Letter, providing input and review throughout the drafting process.  Martocci further informed Geissler that AHL

had to approve the letter before it went out to members. Martocci approved the BFD Letter on behalf of AHL.

43.    NEBC's exhaustive efforts paid off, and ultimately resulted in over $900,000 in new business with the City of Boston for AHL in the first year.

44.    After this initial success which directly resulted from NEBC's business model and relationships, NEBC was poised to expand its ability to offer the AHL products throughout the City of Boston and to agencies of the Commonwealth of Massachusetts.

45.    Indeed, in February of 2016, AHL provided NEBC with a $30,000 advance to assist in its enrollment of the Boston teachers. On information and belief, AHL would not have provided an advance of that amount if it did not have confidence in NEBC's ability to enroll Boston teachers in AHL products.

46.    In the Summer of 2015, AHL terminated an H&P broker named Shannon Lane, prohibiting her from acting as an AHL broker. Martocci informed Geissler that Ms. Lane had been terminated because she instructed enrollers to put sick and overweight employees on guaranteed issue disability insurance products from AHL. Martocci claimed to be involved in the decision to terminate Ms. Lane.

47.    Although he had stated to Geissler that Lane was terminated because of her enrollment practices, Martocci led H&P and Lane to believe that NEBC and Geissler were to blame for Lane's termination. On information and belief, Martocci falsely stated to Snowman and others at H&P that Geissler had influenced the decision to terminate Lane.

48.     Following Lane's termination, NEBC's business relationship with H&P began to rapidly deteriorate.  At the same time, Fire Department employees enrolled in AHL's Accident product began filing claims, and were not receiving full payment as they had been promised.  NEBC worked tirelessly with the enrolled employees, answering questions and providing guidance, but was never informed by AHL that the coverage provided was half what had been promised.

49.     On March 8, 2016, NEBC received a cease and desist letter from the City of Boston, ordering it not to use City of Boston intellectual property to sell insurance products.  H&P received a letter of that same date ordering it to cease and desist transacting with the City of Boston through NEBC, because NEBC was not an approved vendor.

50.     Despite the issues with AHL's coverage described above, NEBC managed to maintain the confidence of the Boston Police and Firefighters Unions, resulting in the Presidents of both Unions sending written recommendations to the City of Boston supporting NEBC's request to become an approved vendor for the entire City in late March of 2016.

51.     Around this same time, AHL's Martocci, at the unilateral request of H&P, and without NEBC's consent as the agent of record for the case, removed NEBC from the case, thus removing NEBC from any future commission stream.

52.     After NEBC was removed from the case, H&P began moving Fire Department employees away from AHL and onto other insurance programs.

53.     On May 25, 2016, Geissler received notice that a Complaint had been filed with the Massachusetts Division of Insurance, alleging that he transferred City of Boston Fire Department employees into "lesser" accident benefits than they had previously enjoyed.  This Complaint remains pending despite the fact that the provision of "lesser" benefits to the Boston Fire Department was the admitted fault of Martocci and AHL, not Geissler or NEBC.  Geissler remains in jeopardy of losing his license as an insurance agent, and has been unable to renew his E&O insurance as a result of this Division of Insurance matter, causing harm to him individually as well as to NEBC.

54.     NEBC and Geissler's business reputations have been irreparably harmed as a result of Martocci's and AHL's actions.  They have received all of the blame for Martocci's and AHL's wrongdoing in failing to provide the promised Accident coverage.  Mr. Geissler has been verbally attacked on numerous occasions, and accused of fraud.

55.     In March 2017, based on the misinformation supplied by AHL and Martocci, the City of Boston Firefighters Local Union 718 transmitted a letter to its members placing the full blame for the lesser benefits problem on Geissler, and Geissler is currently banned from entering any of the City of Boston's firehouses.  All of the business relationships Geissler has worked for years to cultivate have been irreparably damaged, and NEBC has effectively been blocked from any further business with the City of Boston.

56.     On March 3, 2017, Geissler sent an email to BFD and Union leadership attempting to explain the situation with the switch from Transamerica to AHL.  That email outlined the improved coverage provided by AHL as compared to the prior

15

Transamerica coverage.  Martocci assisted Geissler in drafting this email.  On information and belief, Martocci assisted Geissler in drafting this email at the same time he possessed the knowledge that the policies provided to BFD employees were not as promised in the Proposals.

57.     AHL and Martocci's actions have interfered with NEBC's and Geissler's business relationships with not only H&P, but also the City of Boston and the Labor Unions that represent most of its employees, causing NEBC significant and irreparable harm.  NEBC has been completely shut out of the supplemental benefits market in Massachusetts as a result of these circumstances.  Its business is completely ruined.

**COUNT I**
**(Massachusetts General Laws c. 93A, Section 11,**
**Unfair and Deceptive Business Practices)**
**(NEBC and Geissler v. AHL)**

58.     Counterclaim Plaintiffs NEBC and Geissler reallege and incorporate by reference paragraphs 1 through 57 of the Counterclaims.

59.     At all relevant times, AHL, NEBC and Geissler, were and are engaged in trade or commerce as that term is defined by M.G.L. c. 93A, § 1(b).

60.     The conduct of AHL and Martocci stated in this Counterclaim, which occurred primarily and substantially in the Commonwealth of Massachusetts, constitutes unfair and deceptive acts or practices in violation of M.G.L. c. 93A, § 11.

61.     The actions of Martocci alleged in this Complaint were, at all relevant times, undertaken in his capacity as Regional Director, Northeast of AHL, and were conducted on behalf of and for the benefit of his employer, AHL.

62.     AHL's and Martocci's actions, as stated in this Counterclaim, were undertaken in bad faith with the knowledge that the conduct was unfair and/or constituted deceptive acts or practices that violated M.G.L. c. 93A by, among other things: deliberately underselling Transamerica and Combined to get the case, and then performing a fraudulent  "bait and switch," providing half the coverage promised; misrepresenting NEBC and Geissler's roles in the termination of Shannon Lane; influencing Geissler to unknowingly provide misleading communications to BFD employees; and disseminating false information that NEBC and Geissler were to blame for the provision of lesser coverage when they knew it was actually the result of AHL and Martocci's own fraudulent behavior.

63.     False representations during negotiation of a business arrangement give rise to liability under Chapter 93A.  AHL's and Martocci's conduct here is all the more egregious in that they knew and had to know how much time and effort NEBC and Geissler had invested in building its relationships within the City of Boston and knew how crucial those relationships were to NEBC's continued success.

64.     As a direct and proximate cause of AHL's and Martocci's unfair and deceptive trade practices, NEBC has and will continue to suffer substantial direct and consequential damages, in an amount to be determined at trial.

<u>**COUNT II**</u>
**(F.S.A. § 501.201, Deceptive and Unfair Trade Practices)**
**(NEBC and Geissler v. AHL)**

65.     Counterclaim Plaintiffs NEBC and Geissler reallege and incorporate by reference paragraphs 1 through 57 of the Counterclaims.

17

66.    AHL and Martocci committed deceptive acts and unfair trade practices in violation of F.S.A. § 501.201 by deliberately underselling Transamerica and Combined to get the case, and then performing a fraudulent  "bait and switch," providing half the coverage promised.

67.    The actions of Martocci alleged in this Complaint were, at all relevant times, undertaken in his capacity as Regional Director, Northeast of AHL, and were conducted on behalf of and for the benefit of his employer, AHL.

68.    The actions of AHL and Martocci were deceptive in that they made representations that were likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment.

69.    The unfair trade practices of AHL and Martocci were immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.    Specifically, consumers were provided with insufficient insurance coverage, which was much less than the coverage they had had with the other carrier.

70.    The unfair and deceptive acts of AHL and Martocci were wrongfully imputed to NEBC and Geissler, damaging their business relationships and causing harm to their reputations in the community.

71.    As a direct and proximate cause of AHL's and Martocci's unfair and deceptive trade practices, NEBC has and will continue to suffer substantial direct and consequential damages, in an amount to be determined at trial.

## COUNT III
**(Breach of Contract)**
**(NEBC v. AHL)**

72.     Counterclaim Plaintiff NEBC realleges and incorporates by reference paragraphs 1 through 57 of the Counterclaims.

73.     NEBC entered into an agent contract with AHL, effective January 29, 2015 ("the Agent Agreement).

74.     The Agent Agreement contained the provision that "AHL is responsible to [NEBC] for AHL's acts or admissions and the acts or omissions of its employees, agents and subordinate producers."

75.     The Agent Agreement further stated that "AHL will indemnify and hold [NEBC] harmless from any losses or expenses on account of the acts or omissions of AHL or its employees."

76.     By refusing to take responsibility for Martocci's actions, and refusing to indemnify NEBC from any losses or expenses caused by Martocci's actions, AHL breached the express term of the Agent Agreement.

77.     As a direct and proximate cause of AHL's breach of the express term of the Agent Agreement, NEBC has lost the ability to conduct business in the City of Boston and elsewhere in the Commonwealth of Massachusetts, and has suffered direct and consequential damages in an amount not less than $10 million ($10,000,000).

## COUNT IV
**(Breach of Contract – Implied Covenant of Good Faith and Fair Dealing)**
**(NEBC v. AHL)**

78.     Counterclaim Plaintiff NEBC realleges and incorporates by reference paragraphs 1 through 57 of the Counterclaims.

79.     NEBC entered into an agent agreement with AHL, effective January 29, 2015 (the "Agent Agreement").

80.     Under Florida law, every contract includes an implied covenant of good faith and fair dealing.   Good faith means honesty, in fact, in the conduct of contractual relations.

81.     In addition to breaching the express term(s) of the Agent Agreement as outlined in Count III, above, AHL also breached the implied covenant of good faith and fair dealing by engaging in actions designed and intended to deprive NEBC of the fruits of the contract between the parties.

82.     As a direct and proximate cause of AHL's breach of the implied covenant of good faith and fair dealing, NEBC has lost the ability to conduct business in the City of Boston and elsewhere in the Commonwealth of Massachusetts, and has suffered direct and consequential damages in an amount not less than $10 million ($10,000,000).

## COUNT V
**(Fraud)**
**(NEBC and Geissler v. AHL)**

83.     Counterclaim Plaintiffs NEBC and Geissler reallege and incorporate by reference paragraphs 1 through 57 of the Counterclaims.

84.     The actions of Martocci alleged in this Complaint were, at all relevant times, undertaken in his capacity as Regional Director, Northeast of AHL, and were conducted on behalf of and for the benefit of his employer, AHL.

85.     Martocci, acting on behalf of AHL, knowingly and intentionally made a false representation to NEBC and Mark Geissler regarding the coverage that it was providing to the City of Boston Fire Department based on the premiums quoted.

86.     Martocci, acting on behalf of AHL, made these material misrepresentations with the specific intention that NEBC and Geissler would rely on them in recommending AHL as the City of Boston Fire Department's supplemental benefits provider.

87.     NEBC and Geissler did in fact rely on these material misrepresentations, and recommended AHL as the Boston Fire Department's supplemental benefits provider.

88.     On January 23, 2015, Martocci sent to NEBC/Geissler an incomplete version, only page 3 of 3, of the "40/40" form which established the coverage purchased for the BFD.  Martocci did not explain the import of the 40/40 form when he sent it to Geissler in January 2015.

89.     NEBC did not see a full version of the 40/40 form, including Pages 1 and 2, until April 10, 2017, when H&P requested a copy from Martocci.

90.     Martocci intentionally sent the incomplete version of the 40/40 form for the purpose of concealing from NEBC/Geissler the fact that the Accident benefit for rollover employees – employees already enrolled in Transamerica products for whom

NEBC facilitated a passive rollover to AHL - provided only One Unit, while the Proposals promised double the coverage, or Two Units.

91.     The certificates of insurance ultimately provided to enrolled members at the BFD contained the Single Unit coverage only.  Upon information and belief, AHL and Martocci deliberately undersold Transamerica and Combined to get the case, and then performed a "bait and switch," providing half the coverage promised.

92.     AHL has admitted that it issued policies to the rollover employees differing from the Proposals.

93.     AHL's actions in providing only half of the accident coverage promised in the Proposals significantly harmed NEBC and Geissler, and its relationships with H&P, the City of Boston, and the Labor Unions representing City of Boston employees.

94.     As a result of AHL and Martocci's intentional fraud, NEBC and Geissler have been precluded from writing coverage for the City of Boston, and their reputations in the community have been damaged.

95.     As a direct and proximate cause of AHL and Martocci's wrongful actions, NEBC and Geissler have suffered direct and consequential damages in an amount to be determined at trial.

<u>**COUNT VI**</u>
**(Defamation)**
**(NEBC and Geissler v. AHL)**

96.     Counterclaim Plaintiffs NEBC and Geissler reallege and incorporate by reference paragraphs 1 through 57 of the Counterclaims.

97.     The actions of Martocci alleged in this Complaint were, at all relevant times, undertaken in his capacity as Regional Director, Northeast of AHL, and were conducted on behalf of and for the benefit of his employer, AHL.

98.     AHL and Martocci falsely stated to Shannon Lane and to others at H&P that NEBC/Geissler had influenced AHL's decision to terminate Shannon Lane.

99.     This statement was false and damaged the relationship between H&P and NEBC/Geissler, and ultimately contributed to H&P's termination of its contract with NEBC/Geissler.

100.    As a direct and proximate cause of AHL and Martocci's publication of this defamatory statement regarding NEBC and Geissler, NEBC and Geissler have suffered direct and consequential damages in an amount not less than $10 million ($10,000,000).

101.    In addition, AHL and Martocci falsely stated to individuals at H&P and at the City of Boston Fire Department that NEBC/Geissler were to blame for the provision of inadequate coverage to the Department employees, even though AHL and Martocci knew that the inadequate coverage was the result of AHL and Martocci's deception.

102.    As a direct and proximate cause of AHL and Martocci's publication of these defamatory statements regarding NEBC and Geissler, NEBC and Geissler have suffered direct and consequential damages in an amount not less than $10 million ($10,000,000).

103.    Further, as a direct and proximate cause of AHL and Martocci's publication of defamatory statements specifically regarding Geissler, Geissler is the subject of Complaint filed with the Massachusetts Division of Insurance, alleging that he

transferred Boston Fire Department employees into "lesser" accident benefits than they had previously enjoyed. Geissler remains in jeopardy of losing his license as an insurance agent, and has been unable to renew his E&O insurance as a result of this Complaint, causing further harm to NEBC.

104.    As a direct and proximate cause of AHL and Martocci's publication of defamatory statements regarding NEBC and Geissler, NEBC and Geissler have suffered direct and consequential damages in an amount not less than $10 million ($10,000,000).

**COUNT VII**
**(Tortious Interference with Contract)**
**(NEBC v. AHL)**

105.    Counterclaim Plaintiff NEBC realleges and incorporates by reference paragraphs 1 through 57 of the Counterclaims.

106.    At all times relevant, NEBC had a contractual relationship with H&P to collaboratively market voluntary insurance benefits to City of Boston employees.

107.    The actions of Martocci alleged in this Complaint were, at all relevant times, undertaken in his capacity as Regional Director, Northeast of AHL, and were conducted on behalf of and for the benefit of his employer, AHL.

108.    AHL and Martocci knew of the contractual relationship between NEBC and H&P.

109.    AHL and Martocci intentionally interfered with the contractual relationship between NEBC and H&P, by falsely stating that Geissler/NEBC were to blame for the termination of Shannon Lane, and by falsely representing that

Geissler/NEBC were to blame for the provision of inadequate insurance coverage to the City of Boston Fire Department employees.

110.    The publication of these defamatory statements about Geissler/NEBC constituted an improper means of interfering with the contractual relationship between NEBC and H&P.

111.    In addition, AHL and Martocci had an improper motive in interfering with the relationship between NEBC and H&P:  to divert attention away from, and to avoid liability for, AHL and Martocci's own fraudulent behavior in connection with the City of Boston Fire Department policies.

112.    The actions of AHL and Martocci in fact interfered with the contractual relationship between NEBC and H&P, with the result that H&P refused to work further with NEBC and instructed AHL to terminate NEBC's commissions.

113.    As a direct and proximate cause of AHL and Martocci's intentional interference with the contract between NEBC and H&P, NEBC has suffered direct and consequential damages in an amount to be determined at trial.

## COUNT VIII
### (Tortious Interference with Advantageous Business Relations)
### (NEBC and Geissler v. AHL)

114.    Counterclaim Plaintiffs NEBC and Geissler reallege and incorporate by reference paragraphs 1 through 57 of the Counterclaims.

115.    As the result of years of hard work and preparation, NEBC and Geissler developed an advantageous business relationship with the City of Boston, which

culminated in NEBC and Geissler working with the City of Boston Fire Department in assisting BFD in selecting a new carrier for its supplemental benefits.

116.    AHL and Martocci were aware of the ongoing, advantageous business relationship NEBC and Geissler had with the City of Boston.

117.    AHL and Martocci intentionally and without justification interfered with this relationship, by making the false and slanderous statements about NEBC and Geissler, and by fraudulently misleading NEBC and Geissler about the insurance coverage being provided to the Boston Fire Department employees.

118.    But for the wrongful and unjustified interference of AHL and Martocci, the City of Boston would have followed through on its plans to utilize NEBC and Geissler to secure supplemental insurance coverage for its employees.

119.    As a direct and proximate cause of AHL and Martocci's tortious interference with the advantageous business relationship between NEBC/Geissler and the City of Boston, NEBC and Geissler have suffered direct and consequential damages in an amount to be determined at trial.

## <u>NEBC'S REQUESTED RELIEF</u>

**WHEREFORE**, NEBC and Geissler respectfully request that this Court:

1. Enter a judgment in favor of NEBC and Geissler against AHL on all Counts of these Counterclaims;

2. Award NEBC and Geissler the damages they sustained as a result of AHL's and Martocci's conduct alleged in these Counterclaims, in an amount to be determined at trial;

3.  Award NEBC and Geissler their recoverable costs and reasonable attorneys' fees;

4.  Award NEBC and Geissler treble damages under their claim for relief under M.G.L. c. 93A, Count I; and

5.  Award such other and further relief as may appear just and proper.

### **<u>JURY DEMAND</u>**

NEBC and Geissler demand a trial by jury as to all issues so triable.


TORRES, SCAMMON, HINCKS                SMITH HULSEY & BUSEY
& DAY, LLP

By /s/ *Kristen Schuler Scammon*          By /s/ *John R. Thomas*
     Kristen Schuler Scammon              Stephen D. Busey
                                    John R. Thomas


Massachusetts Bar Number 634586        Florida Bar Number 117790
35 India Street                        Florida Bar Number 77107
Boston, MA 02110                       Smith Hulsey & Busey
(617) 307-4426                         225 Water Street, Suite 1800
(617) 307-4427 (facsimile)             Jacksonville, Florida 32202
kscammon@tshdlegal.com                 (904) 359-7700
                                       (904) 359-7708 (facsimile)
                                       busey@smithhulsey.com
                                       jthomas@smithhulsey.com


Attorneys for New England Benefits Connect, LLC and Mark Geissler

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on August 16, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none.

/s/ *John Thomas*
Attorney